Filed 4/27/23; Certified for Publication 5/15/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ENRIQUE ROMERO et al., | B310152 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV00679) |
| v. | |
| LOS ANGELES RAMS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Blair & Ramirez, Oscar Ramirez, Matthew P. Blair and Kirill Lavinski for Plaintiffs and Appellants.

Manning & Kass, Ellrod, Ramirez, Trester, Robert P. Wargo, Jeffrey M. Lenkov and Steven J. Renick for Defendant and Respondent Los Angeles Rams.

Murchison & Cumming, Gina E. Och; Skane Mills and Heather L. Mills for Defendant and Respondent Contemporary Services Corporation.

Appellant Enrique Romero was injured by fellow fans at the Los Angeles Memorial Coliseum (Coliseum) near the end of a Los Angeles Rams football game. Enrique, his wife and two daughters (appellants) brought this action against Contemporary Services Corporation (CSC), the Los Angeles Rams (Rams) and the University of Southern California (USC), alleging causes of action for negligence, premises liability and related ancillary torts. All three defendants obtained summary judgment in their favor. This appeal involves two of the defendants: CSC and the Rams.[1] CSC is an entity hired to provide crowd management services at the Coliseum during certain events, including Rams football games. In granting CSC's and the Rams' motions for summary judgment, the trial court assumed that both defendants had a duty to protect Enrique and his family and had failed to take the ameliorative steps proposed by appellants. Nevertheless, the court granted summary judgment on the ground that these failures, as a matter of law, were not the cause of the assault.

Appellants appeal, contending the trial court erred in finding they had failed to create triable issues of fact concerning causation. We affirm the judgment.

---

[1] The record in this case reveals that USC filed its motion at the same time as CSC and the Rams, but that motion was denied without prejudice on the ground of defective service. We take judicial notice of the record in case No. B313461, also before this court on appeal; that record shows that USC subsequently refiled its motion, which was granted by a different trial court on a different ground.

## BACKGROUND

For the 2017–2018 season, the Rams played their home games at the Coliseum, pursuant to an agreement with USC. For purposes of the motion for summary judgment, the Rams conceded they had a duty to protect the fans in the Coliseum.

Some of the security at the Rams games was provided by off-duty Los Angeles Police Department (LAPD) officers and Apex Security Group, Inc. (APEX) security personnel. Some LAPD officers were hired directly by USC, and others by the Rams. APEX is a subsidiary of CSC, but the record does not show what control, if any, CSC had over the deployment of APEX personnel.

CSC's contract with USC called for CSC to provide crowd management services at the Coliseum, and the Rams were required to use CSC for this purpose. CSC divided its staff into two categories: event staff and security staff. Event staff are not authorized to perform any security functions. Security staff are required to have a security guard card. They perform some security functions such as gate searches. CSC told both its event staff and its security staff not to intervene in any verbal or physical altercations involving fans. Their role was to observe and, if necessary, refer those matters to LAPD and APEX.

Kevin Daly, USC's event manager for Rams' games, explained USC's expectations of the various security providers. He testified USC expected LAPD to become involved when someone was breaking the law. In the event of a fight, USC instructed CSC "to not get hurt and to be the best witness they can be to a situation. But we do not ask them to intervene where they might be harmed or suffer injury." The parties do not discuss APEX'S role in any detail on appeal, but it appears APEX

3

personnel were authorized to intervene in some altercations and to eject fans from the Coliseum.

LAPD officers, APEX personnel, and CSC event and security staff were present inside and outside the Coliseum for the January 6, 2018, play-off game which Enrique attended with his wife Karina and his two daughters Alannah and Yasmine.

Near the end of the game, Enrique and Yasmine walked from their assigned seats to the section of the Coliseum where family members of the Rams players were seated (Family section).[2] This section was closer to the field, and Yasmine wanted to take photographs of the players and greet them. The only CSC staff assigned to this seating area were two event staff employees, who were essentially ushers.

At about this same time, CSC supervisor James Mayhan was informed by a Rams employee that there was "an issue" in the Family section near the Romeros. Mayhan went to the Family section, where another CSC supervisor was already present. Mayhan observed overcrowding in the aisle and asked the Romeros and others to return to their seats. The Romeros did not move out of the aisle and return to their seats. At this point, a verbal altercation developed between Enrique and some of the Rams family members.[3] Mayhan positioned himself between Enrique and the row of family members and explained to Enrique

---

[2]     There is contradictory evidence about exactly when Enrique and his daughter went to the Family seating section. We discuss this in more detail in section D.4, *post*.

[3]     Mayhan did not describe an ongoing verbal altercation when he arrived, but his testimony did not rule out that a verbal altercation started before he arrived.

that he, Mayhan, needed to escort the family members out of the section.

Enrique and his daughter began to walk up the aisle. Mayhan moved to allow the family members out of their row, and they began to walk up the aisle as well, with Mayhan behind one or more of the family members.[4] The verbal altercation continued as Enrique and the Rams family members walked up the aisle.

At some point, Enrique walked into a row of seats and stood about four to five seats into the row. As the Rams family members walked by Enrique, he waved good-bye to a specific female family member with whom he had been having the verbal altercation. Mayhan heard someone say the word "bitch." The female family member turned and ran into the row where Enrique was standing and slapped him. Mayhan began scrambling to get between the woman and Enrique and was able to get over a seat and position himself between the two. Mayhan was immediately hit in the back of the head and knocked to the ground for about five to seven seconds. When Mayhan stood up, he saw that Enrique had a gash over his eye.

Although there had been crowding in the Family section at the end of previous games, this was the first known fight in that area.

Enrique's gash required stitches and he was advised to have a titanium plate implanted in the area next to his eye socket to prevent further/future damage to his eye. He testified at his deposition that he did have such a plate.

---

[4] According to Enrique, Mayhan was in front of all the family members.

Appellants initially brought this claim against the Los Angeles Memorial Coliseum Commission, the City of Los Angeles, the County of Los Angeles, the State of California, and an individual named Jada Woolfolk, as well as CSC, the Rams and USC. Appellants subsequently dismissed the governmental defendants and Woolfolk.

## DISCUSSION

" 'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) We consider evidentiary facts, not conclusions or "ultimate" facts. (See, e.g. *Hayman v. Block* (1986) 176 Cal.App.3d 629, 639.)

Summary judgment is appropriate only where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action. (*Regents, supra*, 4 Cal.5th at p. 618.) The elements of a negligence cause of action are 1) the existence of a duty, 2) a breach of that duty, 3) injury to the plaintiff caused by the defendant's breach, and 4) actual damages. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 529.)

A.    *Trial court proceedings*

The trial court granted CSC's and the Rams' motions on the ground that appellants could not show causation.  Causation is ordinarily a question of fact which cannot be resolved by summary judgment.  Causation may be decided as a question of law if under the undisputed facts, "there is no room for a reasonable difference of opinion."  (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1687.)

CSC moved for summary judgment on two grounds:  it had no duty to protect appellants and appellants were unable to prove that it was more probable than not that the additional security precautions they proposed would have prevented the attack.  The trial court summarized appellants' arguments in opposition to CSC's motion for summary judgment as 1) CSC had a duty to protect them from the criminal acts of third parties, and 2) CSC "was negligent in providing inadequate security personnel in terms of numbers, training and equipment (specifically communications equipment)."

Appellants contended  CSC should have taken these specific measures: (1) authorize staff members in the seating bowl to enforce the Fan Code of Conduct, including ejection of fans; (2) provide radios to CSC employees deployed in the lower bowl; (3) provide radios capable of direct communication with LAPD or APEX to CSC employees deployed in the seating bowl; (4) inform CSC employees deployed in the seating bowl about LAPD and APEX deployments; (5) timely call LAPD and/or APEX to the verbal altercation involving Mr. Romero; and (6) keep Mr. Romero and his assailants physically separated until LAPD and/or APEX arrived on scene.

The trial court recognized that, in contrast to CSC, the Rams conceded for purposes of summary judgment that they had "some" duty to provide security at the Coliseum during games. They contended, however, that in the absence of prior incidents in the Family section, they had no duty to provide additional security personnel in that section.

Appellants contended that overcrowding in the Family section made an altercation there foreseeable. Appellants also contended the Rams should have: (1) provided enough LAPD officers in the seating bowl to "maintain order, deter violent fights among the massive crowd of attendees, ensure the safety of attendees and discourage overconsumption of alcohol"; (2) implemented "adequate security measures"; (3) ensured that security personnel in the seating bowl were aware of LAPD and APEX deployments; (4) ensured that CSC staff members could directly communicate with LAPD and/or APEX; and (5) provided additional security personnel to the Family section in light of prior complaints.

The trial court separately analyzed each defendant's motion for summary judgment, but for both motions stated it would assume for the sake of the motion that the defendant should have taken the measures identified by appellants, and had failed to do so. The trial court then granted both motions, finding appellants did not show that CSC's and the Rams' failure to take ameliorative steps was a substantial factor in causing the assault.

B.  ***Duty***

On appeal, appellants argue CSC and the Rams had a duty to take reasonable steps to protect them against the foreseeable criminal acts of third parties. Like the trial court, we will

8

assume both CSC and the Rams had such a duty. The scope of that duty to protect is a question of law for the court. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 (*Olsher*).)

The duty analysis developed by the California Supreme Court "requires the court in each case (whether trial or appellate) to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake. . . . 'This frames the issue for the court's determination by defining the scope of the duty under consideration.' " (*Olsher, supra,* 41 Cal.4th at p. 1214.) Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed on the landlord. (*Ibid.*)

Here the trial court largely accepted the ameliorative steps proposed by appellants, with two exceptions. The trial court found no evidence that CSC could control the deployment of APEX or LAPD personnel and no evidence that the Rams could control or increase the number of LAPD personnel. Thus, the court declined to impose the duty identified in the ameliorative steps related to the number and deployment of LAPD and APEX personnel. The accepted steps then defined the scope of CSC's and the Rams' duty.

On appeal, appellants do not contend the trial court erred in modifying the scope of CSC's and the Rams' duty to exclude ameliorative measures related to LAPD and APEX. In discussing ameliorative measures on appeal, however, appellants omit the list of measures they identified in opposition to the Rams' motion. They attempt to aggregate CSC and the Rams, contending they identified six ameliorative measures "respondents" should have

9

taken to prevent Enrique's injuries. These measures were "(1) providing staff members in the seating bowl that were authorized to enforce the Fan Code of Conduct, including the ejection of fans; (2) providing CSC employees deployed in the lower bowl with radios; (3) providing CSC employees deployed in the seating bowl with radios capable of direct communication with LAPD or [APEX]; (4) providing CSC employees in the seating bowl with information about LAPD and/or [APEX] deployments; (5) timely escalating the verbal altercation involving Mr. Romero to LAPD and/or [APEX]; and (6) keeping Mr. Romero and the Assailants physically separated until LAPD and/or [APEX] arrived on-scene." As the record citation reveals, these are the steps appellants identified in opposition to CSC's motion for summary judgment.

In the trial court, as discussed above, appellants identified a somewhat different set of measures which they claimed the Rams should have taken.[5] Appellants do not repeat their contention that the Rams should have taken these previously identified measures, but do argue that the Rams "owed the Romeros a nondelegable duty to maintain the premises in a reasonably safe condition. [Citation.] The Rams cannot, therefore, escape liability for the negligent handling of the incident by CSC staff, who failed to take a number of reasonable

---

[5] There is some overlap with the CSC measures. Appellants contended the Rams should have "ensured" that security personnel in the seating bowl were aware of LAPD and APEX deployments; and that CSC staff members could directly communicate with LAPD and/or APEX. They also contended, vaguely, that the Rams should have provided "additional security personnel to the Family [s]ection in light of prior complaints."

10

ameliorative measures discussed below." We will assume solely for purposes of this appeal that the Rams would be liable for CSC's negligence. We will treat appellants' omission on appeal of the ameliorative measures they identified for the Rams in the trial court as a concession that there were no ameliorative measures which the Rams should have taken to prevent Enrique's injuries.

We note that well after specifying and discussing the ameliorative measures which they claim CSC should have taken, and under a heading indicating its subject was breach of duty, appellants contend "triable issues of fact exist as to whether, among other things, Respondents failed to properly coordinate security responsibilities between the Rams, USC, CSC, [APEX], and LAPD; whether they failed to properly train and authorize CSC employees to handle fan altercations; and whether CSC's employees were negligent in failing to keep the Assailants physically separated from the Romeros." This Columbo-like briefing of adding "just one more thing" is not a helpful way for appellants to structure their arguments; nor is indirectly identifying additional ameliorative steps by negative implication in a list of breaches rather than in the list of duties. Further, appellants may not propose new ameliorative steps for the first time on appeal.

Turning to the substance of these failures, only physical separation is clearly included in appellant's list of ameliorative measures. In the trial court, appellants used the phrase "coordinate security" to refer to steps 2 through 5 collectively, and we will treat it as having the same meaning on appeal. We will similarly treat the failure to train claim as equivalent to the

11

ameliorative measure previously identified in the trial court as providing personnel trained to enforce the Code of Conduct.

## C.    *Breach*

The trial court assumed for purposes of the summary judgment motion that CSC had a duty to take the suggested ameliorative measures, and that CSC had failed to do so.  We will do the same.

## D.    *Causation*

Having assumed duty and breach, the trial court decided the summary judgment motion on the basis of no causation.  The trial court found that none of the breaches were a substantial factor in causing Enrique's injuries, specifically that it was not more probable than not that the ameliorative measures proposed by appellants would have prevented the attack.

Appellants contend that the trial court applied the wrong standard for causation.  They acknowledge they were required to show that CSC's acts or omissions were a "substantial factor" in causing Enrique's injury.  They contend the substantial factor standard "is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978 (*Rutherford*).)  According to appellants, "a very minor force that does cause harm is a substantial factor." (*Bockrath v. 31 Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)

While these quotes are accurate, they are taken out of context.  Both cases are discussing comparative negligence in product liability cases where multiple defendants have manufactured the defective product.  In this context, the contribution of an individual defendant's product to the plaintiff's

injury need only be "more than negligible or theoretical" for the defendant to be liable. (*Rutherford, supra,* 16 Cal.4th at p. 978.) This standard applies once there is proof that the product caused the plaintiff's injury and looks at an individual defendant's share of liability. To show that the product caused the injury, "the standard of proof" ordinarily required is " 'a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to [the] plaintiff's injury.' " (*Id.* at p. 976, fn. 11.)

As the California Supreme Court has put in a non-medical context: " 'On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.' " (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205–1206.) More specifically, in a case like the one before us, the plaintiff is required "to prove it was 'more probable than not' that additional security precautions would have prevented the attack." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 776 (*Saelzler*).)

1.  *Train CSC staff to enforce Fan Code of Conduct*

Appellants contend that CSC should have provided staff in the seating area who were trained to enforce the Fan Code of

Conduct including ejecting fans.[6] This is in effect a claim that CSC should have provided additional security personnel. As the trial court correctly noted, the bare claim that more security personnel could have prevented a criminal attack shows only "abstract negligence." (*Saelzler, supra,* 25 Cal.4th at p. 773.) There must be direct or circumstantial evidence showing that the assailant took advantage of the defendant's lapse or omission "in the course of committing his attack, and that the omission was a substantial factor in causing the injury." (*Id.* at p. 779.) When the claimed lapse or omission is insufficient security personnel, this can be a difficult burden to meet because " '[n]o one can reasonably contend that even a significant increase in police personnel will prevent all crime or any particular crime.' " (*Id.* at p. 777 quoting *Noble v. Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 918.) "[A]ssaults and other crimes can occur despite the maintenance of the highest level of security." (*Saelzler*, at p. 777.)

On appeal, appellants contend that if security personnel who were authorized to eject fans pursuant to the Code of Conduct had been present in the seating area, they could have ejected the family members, and perhaps Enrique himself, while the altercation was still verbal, and before it escalated to physical

---

[6] We note appellants claim this would not necessarily require more security personnel, just better training of the existing CSC staff assigned to the seating area and so the burden would be minimal. The burden of a measure is relevant to the scope of duty, not causation. (See *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.) We note, however, that appellants have not provided evidence showing that the burden of such training would be minimal. We strongly question whether it would be.

14

assault.  Put differently, appellants are contending that the family members took advantage of CSC's failure to eject them, and that this failure was a substantial factor in Enrique's injury. This does not appear to be an argument which was developed in the trial court.  The record shows, however, that Mayhan began the process of removing Enrique and the family members from the family seating area while the altercation was still verbal.

Mayhan directed Enrique to clear the aisle in the family seating area, and it is undisputed that Enrique began walking up the aisle.  Mayhan then began to walk up the aisle with the female family member and her companions.  Although neither of these actions were a formal "ejection," they would have accomplished the same result as an ejection:  the departure of the female family member from the Coliseum and Enrique from the seating area before the verbal altercation had become physical.[7] Thus, CSC was doing what appellants contend it should have done to prevent an assault, but the assault still occurred.  It is hard to imagine a clearer example of no causation.  There is no room for a reasonable difference of opinion here.

---

[7]     The family members' departure had many of the hallmarks of a formal ejection.  Mayhan stated he tried to "guide" and "direct" the female family member.  Enrique described the female family member's departure as being "escorted out by security." and agreed with the characterization that she "broke apart from the security guard" and ran into the row to slap him.  Appellants have not shown that a formal ejection of an apparently compliant fan should have been conducted differently, apart perhaps from their claim that common sense required physical separation, which we discuss separately.

2. *Maintain physical separation*

On appeal, appellants repeat the ameliorative measure of "keeping Mr. Romero and the Assailants physically separated until LAPD and/or [APEX] arrived on-scene." Generally, in the trial court, when appellants discussed physical separation, they were referring to CSC personnel positioning themselves in between the parties. When they discuss this measure on appeal, however, they also contend that CSC should not have attempted to escort the family members "directly past the Romeros in contravention of the commonsense measure to keep parties in a verbal altercation physically apart from each other and thus preclude escalation into physical violence."[8] They then contend there is a triable issue of fact concerning whether Mayhan's decision "to escort the Assailants within arm's reach of Mr. Romero, with who[m] they had been feuding verbally, was a substantial factor in causing the assault."

"Directly past" is a vague term, and "within arm's reach" an even vaguer one, but the record does not show Mayhan escorted the family members so close to Enrique that they could reach him while they were in the aisle walking past him. Enrique himself testified that he moved four or five seats into a row to let the family members pass. Both Enrique's and Mayhan's description of the assault showed that the female member had to turn, leave the aisle, enter the row where Enrique was standing and then move into the row to reach Enrique. Put differently, she did not slap him while she was standing in the aisle. The male family members were behind the female and Mayhan and so were even

---

[8]     Thus, appellants essentially abandoned the "until LAPD and/or APEX arrived" aspect of this step in the trial court.

farther away. Since there is no evidence that Mayhan escorted the family members "directly past" or "within arm's reach" of Enrique, there is no triable issue of fact concerning whether such an act was a substantial factor in causing Enrique's injuries.

As for appellants' trial court argument that CSC should have "physically separated" the parties by having a CSC employee stand between the parties, the trial court found there was no evidence that "keeping Romero and the assailant 'physically separated' would 'more likely than not' have prevented the (post-slap) attack which caused a gash above Romero's eye." The court specifically found that Mayhan was able to physically place himself between Romero and the female family member after the slap. The evidence shows that Mayhan was then also between the male family members, as they knocked him down to get at Enrique. The court found there was no evidence that another CSC employee would have been able to separate the parties without being attacked or that Mayhan's attempt to separate the parties was deficient. Put differently, the undisputed evidence showed that the physical presence of a CSC employee did not prevent the attack from occurring. There is no room for a reasonable difference of opinion here.

### 3. *Better communications*

Appellants contend the trial court erred in finding that LAPD and APEX would not have arrived before the assault occurred even if CSC had called them as soon as it had notice of overcrowding in the family section. The trial court stated "CSC only had notice of overcrowding in the [F]amily section with less than five minutes remaining in the Rams game" and since the average response times of APEX and LAPD were over eight and

17

nine minutes respectively, they would have arrived after the assault.

Appellants contend the trial court wrongly equated five minutes remaining in the game with five minutes in real time. They contend that football games had timeouts, commercial breaks and two minute warnings at the end of the game that multiply the actual duration of the last few minutes of each game. Appellants do not provide a record citation to support this contention. Even if we were to take judicial notice of the common fact that the clock may be stopped in a timed game by various occurrences, there is nothing in the record on appeal to show that such stoppages actually occurred in this game or how long any stoppages were. We cannot simply guess at what the "real time" was. Put differently, we have no basis to find that time left to play did not equate to real time and so no basis to find error on the part of the trial court.[9]

Appellants further contend the better communication measures of steps 2 through 5 would have resulted in a faster response time by APEX and LAPD, who were better trained to prevent assaults. They contend there is triable issue of fact as to whether respondents' failure to take those steps was a substantial factor in causing the assault.

_____

[9] We note that in his deposition, Enrique estimated that about two to four minutes elapsed between his arrival in the family section and the assault, which is not consistent with his claim on appeal that substantially more than five minutes elapsed. To the extent that Enrique attempted to contradict his deposition testimony and provide a longer time estimate in his declaration in opposition to summary judgment, we disregard that declaration. (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087.)

18

There is evidence that CSC staff, even supervisors such as Mayhan, could not communicate directly with LAPD or APEX via radio. They would contact CSC command, who would in turn contact LAPD or APEX. They could contact LAPD or APEX directly if those personnel were in the area.

Appellants do not provide any record citation showing how response time was measured. Appellants seem to assume that response time is measured from when a CSC employee first decides to seek assistance from APEX or LAPD to the time APEX or LAPD personnel arrives, but we cannot simply assume that is what it measures. It is equally, if not more, likely that response time is measured from when APEX or LAPD receive the request for assistance from CSC command. If the latter were true, improved communications by CSC staff would not improve APEX or LAPD response time. (Such communications could only reduce the unknown time it took for a request to travel from a CSC employee to the CSC command center.)

In the absence of the above-described evidentiary fact, appellants have not created a triable issue of fact concerning whether improving CSC communications would have prevented the assault.

## DISPOSITION

The judgment is affirmed.  Appellants to bear costs on appeal.


STRATTON, P. J.

We concur:



GRIMES, J.



VIRAMONTES, J.

Filed 5/15/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ENRIQUE ROMERO et al., | B310152 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV00679) |
| v. | |
| LOS ANGELES RAMS et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on April 27, 2023, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports.

[There is no change in the judgment.]

_____

STRATTON, P. J.            GRIMES, J.            VIRAMONTES, J.